Good morning, Your Honors. Matthew Inslee Pruitt on behalf of the Plaintiff's Appellants. I would like to first off thank you, the Court, for accommodating our schedule for rescheduling this hearing. And second, I would like to reserve three minutes to respond to the defendant's arguments. Now we believe that the Court below made several reversible errors, but I want to first draw your attention to the issue that the defendants have said is the heart of the case, and that is the definition of the dietary supplement glucosamine sulfate potassium chloride. Now the Court below goes through this as our expert, Dr. Spingarn's, disagreement with both the defense experts and the scientific community, but that is incorrect based on the evidence below. Dr. Spingarn has testified that this substance is one chemical that has all four ions together in a mixed salt, one crystal, a single crystal. Now the defendants' expert, Dr. Klippenhoff, said on the stand, he agreed, that glucosamine sulfate potassium chloride constitutes all four of these substances, all four of these ions together in the mixed salt. I don't see how you can grant summary judgment when not only is there not a dispute over the definition, but the defendants' own expert agrees with the plaintiff's expert about this issue, about what is supposed to be inside of glucosamine sulfate potassium chloride. Now it's not just the experts in this case, it's also the scientific community that agrees with Dr. Spingarn. For example, the USP Common Methodology, Compendium Methodology, sorry, for testing for glucosamine sulfate potassium chloride starts off the entry with a definition, with a chemical notation that shows that all these substances are together as one. But didn't Mr. Spingarn agree that defendants' product met the reference sample and met the asset out in the Compendium Digest? Your Honor, I'd like to make a distinction there. He does not say it would meet the definition. The definition really isn't in dispute here. The definition of what it's supposed to be is all four things together. What he said is that the substance that is sold by defendants, he assumed, would pass the test that is contained within the USP. However, everybody agrees that that USP test cannot tell the difference between true glucosamine sulfate and a mixture of glucosamine hydrochloride and the fertilizer sold as potassium sulfate in one situation, in a loophole. That situation is when you have that two-to-one ratio between glucosamine hydrochloride and potassium sulfate. Dr. Klybenow, defendant's own expert, said, if you wanted to defraud the consumer, what you would do is you would mix it in this exact ratio, which we can tell from the manufacturing documents, is the ratio used by defendants. So if you want to defraud the consumer, you mix it in this ratio, and that's a loophole for the test, and it would pass the test. So everyone agrees that this test is not sufficient to tell the difference between what true glucosamine sulfate is and what this improper mixture is. We can also see that- The defense counsel points to some testimony in the record where Mr. Spingarn says, well, I've actually never encountered this type of glucosamine sulfate in a single crystal. I don't remember the exact- In the commercial products, yes. Yeah. So it was as if he had never seen a material that would meet what he considers the chemistry definition of glucosamine sulfate potassium chloride, because everything that he's seen was a blend of the two crystals, not a single crystal. So that's the argument that defense counsel raises based on that statement. Is that incorrect? Is there an easy-to-manufacture find, or there is a specific substance that meets what you're calling true glucosamine sulfate? Well, I think that Dr. Spingarn is correct, that he has not encountered this in the wild, so to speak. And I think this is consistent with the only academic paper that has been submitted on the record, the document that we call the Savin article, where the authors went looking at commercially available glucosamine sulfate dietary supplements, under the assumption that it should be a single crystal in there. What they found when they looked at a variety of other manufacturers, not defendants, other manufacturers' products, is they couldn't find the true substance either. And we've been litigating this case for years. We've gone through an evidentiary hearing. We got samples from the defendants. We also tested another 13 bottles. We tested 25 bottles. We've never seen it in all the things from the defendants that we've looked at. But defendants, in that time, also have never shown us, never pointed to us, anything that indicates that there's a single crystal that contains all four ions in their product. So if I understand this correctly, there's a substance that's being sold commercially that meets the standards and tests, and then there's another substance that your expert says is the true substance, and he hasn't found it anywhere. Is that correct? There is a substance that is being sold commercially that can take advantage of a loophole in the test. Would I take it that, in effect, your complaint is against all of the industry, that they're all selling? They're not in this case, but what you're saying is that anybody else would have the same problem, that there's not a product on the board, on the shelves anywhere, that meets your definition. Is that fair? In Dr. Spingar's experience so far, he has not encountered it. That doesn't mean it's a unicorn. That doesn't mean that this is a fictitious thing that we've made up. I don't think anybody's saying that it doesn't exist in the laboratory, but I'm just trying to get the flavor of it. Help me here, because we've got lots of different words, and I'll try not to stumble over them. In this case, the front label at this point read glucosamine sulfate. Later on, they changed that front label. Am I correct that that change wouldn't affect your complaint? You would have just as much complaint against the changed label. Is that correct? Correct, Your Honor. It's just as false now as it was before. Okay. And there's this other phrase, glucosamine hydrochloride, which I take it you're saying is in this product, and it really shouldn't be given the label. Is that correct? Correct, Your Honor. In fact, there are... Okay, let me stop you there. So then is it a burden of proof question? That is, do you need to prove that GH, I'll call it, is in there, or do they need to prove that GH isn't in there? Well, this is an interesting question procedurally, Your Honor, because this is an affirmative defense that has been raised by the defendants that our claim is preempted, that they have sought summary judgment on, with the argument that we have failed to show that there's a valid test available. There's many steps here. I think we have gone far enough to show that there is sufficient, valid scientific evidence that what we have detected in the bottle is something that's not supposed to be there, which is the GH, as you said, which is the fertilizer that's known as potassium sulfate. Neither of these things are mentioned at all in the label, and we have what we believe is proper scientific evidence that has shown this, at the very least on summary judgment to show a dispute, and in particular with respect to an affirmative defense regarding preemption. Do you agree that, or have you abandoned your claims regarding the supplemental facts where the ingredients are listed as being preempted? Well, Your Honor, we think that everything about this product is wrong, the front, the back, the inside, but I don't think that we have waived the argument regarding the supplement facts in the back. We think that both the front label and the back label are wrong. We think that the standard is a little bit looser. But is your claim preempted with respect to the supplemental facts? I don't think it's preempted at all. In either circumstance, I think we have satisfied the requirements under 101.36 if we were to have that apply to the back panel. I think that we have done valid testing on a sample of 12 products that were provided to us by the defendants, so I don't think that the preemption would apply. Your brief on appeal seems to focus mostly on the mislabeling claim and the fact that the supplement is marketed under the name glucosamine sulfate. I think that we have—I'm preserving both arguments, Your Honor. I do not concede that we are saying that the back panel is correct, and I do not believe that we are preempted with respect to the requirements of testing under the 12-sample test for the back panel. Okay. Okay. Okay. So I also want to come back to a point of error in the district court's opinion, where the court found that the FDA has relied on compendial methods, and this whole idea that if you pass a compendial method, that's enough. But we know that that's not the case, and we know that's not the case because the FDA was asked, when it was evaluating and creating regulations for good manufacturing guidelines, to include in the definition of a valid test, a scientifically valid test, to include compendial methods. They refused to do so because they said that whether or not a method is scientifically valid is not determined solely by its inclusion in a compendium, and that's important because the FDA wants to make sure that stakeholders are assessing the tests that are used, that they're not blindly applying a compendial method here, that they're not looking for a safe harbor, that if they just pass a test, they can ignore it and move on, right? They need to still have that responsibility to ensure that the test that they are using is appropriate. For example, the AOAC method, everyone agrees that all it can do is count the amount of glucosamine in there. It can do nothing to tell the difference between GH or glucosamine sulfate that is present in the product. USP, that methodology, as I've discussed many times, has a giant loophole where you can commit fraud by selling the wrong thing under that compendial method. So, Dr. Spingarn, as I said, conducted valid scientific experiments to determine the crystal shape of the substance that is present. We think that there's a lot of evidence out there that these are widely accepted. As I mentioned in the Sabu article before, using the exact same methods, or very similar methods as Dr. Spingarn, the FTIR, the XRD, we also see it in the patent literature where people are trying to determine glucosamine sulfate by using XRD. Dr. Spingarn used these methods, and he himself compared against reference samples that are contained in the databases within these machines. So he has found that the substances that are in these products match the references already for glucosamine hydrochloride and for the fertilizer known as potassium sulfate. So we know that they're in there. The question is, now defendants say, well, if it matches this other thing, you can call it something else. That doesn't make any sense if the product matches two different certified reference samples because there's a requirement for the product to use a usual and common name that is not confusing. So I see my time is just about up, but I do want to point out that we've been litigating this case for years, as I said, but it's still unclear to me what defendants are saying that they are selling in their bottle. I don't have a clear statement from defendants if they think that they're selling a single crystal or if they think that they're selling a blend of two different products. So I'm still confused after all this time. I think they're kind of stuck in a jam. So with that, I reserve my time. All right. Thank you, counsel. Good morning. John Claude, on behalf of the defendants. I want to bring this case back to what it's really about. It's not about fertilizer. There's one reference in Appellant's Excerpt of Record on page 175 where Dr. Spingarn mentioned fertilizer and now Mr. Inslee-Pruitt's mentioned it a couple times here at argument. There's no 102.5C1 claim, which is what you would have to bring if you were challenging kind of a foreign, adulterating ingredient, and moreover, the regulation with respect to fertilizer tolerates its use as a flavoring agent, and it specifically talks about it being in certain foods and soft drinks. Nor is this case about intent to defraud with respect to that particular statement. That was actually Dr. Klybanov responding to a hypothetical from Dr. Spingarn. So Dr. Spingarn, at the top of page 271 of Appellant's Excerpt, mentioned this hypothetical about how if you could actually match the precise quantities of these two chemicals, you might be able to sneak it past the regulators. But at the same time, Dr. Klybanov also said it's tricky and it didn't happen here. And he said it didn't happen here because, contrary to what Mr. Inslee-Pruitt just said at the end, as far as what we think we're selling, we do have specifics of analysis both from the raw material suppliers in China and then ones that International Vitamin Corporation had to prepare on their own upon receiving the raw materials and making these products, and both show that what was tested, what was shown using the USP method, which is what the FDA approves, is glucosamine sulfate potassium chloride. And so we absolutely think we are selling a single crystal variety because, again, the tests, the specifics of analysis all show that what our raw material suppliers did is they precipitated a single salt using a specially patented method. So, counsel, sort of the same question I asked your adversary is, is this sort of a burden of proof question in terms of, is there this GH either as a contaminant or a major component? You've just given us some good reasons that GH isn't in there. Have they contradicted that, or have you met a burden of proof, or have they not met a burden of proof for GH being in there? So I'm going to try to answer your question directly, but unfortunately, because, as Mr. Inslee said, there aren't a lot of layers here, and it's complicated. This is a preemption affirmative defense on summary judgment, but because it is preemption, it is an issue for the court, and that's why Judge Wilson, I think, sensibly said, I can't deal with this on the papers. I need live witnesses to come in here. This case is unlike, I guess, what I'll call the mine run FDCA preemption case, where the does this label comply with the various things that the FDA has said it needs to say or do. What makes this case different is that what is preempted here is plaintiff's method for challenging what's on the label, so it's a layer further back, and while we may bear the burden as the movement, and because it's an affirmative defense, we satisfied that burden here by putting on two witnesses, Dr. Sullivan and Klybanoff, and our certificates of analysis showing what the raw materials were, and most particularly in crossing Dr. Spingarn, where he admitted, as Judge Ikuda noted at the outset, that he's never seen the product that he claims is in our bottle, or he's never seen the product that is advertised in the wild, and that when he tested our product, it actually matched the reference standards that the FDA says he had to use, so I don't think there's a burden of proof issue, Judge Boggs. It's just kind of, you have to go through a couple turns to get there, but ultimately, you know, the entirety of this record was before Judge Wilson. He was functionally acting as fact finder on this issue, as he's perfectly well within his rights to do on a preemption case, and he decided that Dr. Spingarn's methods were not appropriate and reliable to challenge our label. So, can I just wrap that up, then, by when you said effectively, I thought I heard you say that his method is preempted because their whole argument is premise on his coming up with findings that other people have not, using his method, and you say that you've done it right using the FDA's method. Is that a fair way of looking at it? Fair. I don't want to oversell my own point. Because what we are attacking is Dr. Spingarn's methodology, which then, of course, infects all of plaintiff's claims under preemption analysis, we didn't have to prove that our label was FDA regulation compliant. We instead decided to attack their attack on us, and again, that's where it gets a little bit messy. We think we did prove that our label is compliant, but focusing in on what Dr. Spingarn did, what you said was correct, Judge Boggs, his method is not appropriate because the FDA has laid out how you go about challenging either the Supplement Facts Panel's representation as to what is in the product, or what is on the front label of the product. But, counsel, that's where you lose me, because it seems to me that the Amquisica case and the Durnford case both make a distinction as to the front label, what's set on the front label, and what your client said on the front label was glucosamine sulfate, and what's set on the back, which is what it was actually, and the testing isn't required as to the front label. It just is or is not what it purports to be. And in this case, there are chemical, there's two different chemical formulas and two different molecular structures for each of these things, and yours says one on the front label, but on the back it says it's something else. Well, I'll try to unpack everything there, Judge Wardlaw. As far as the label, so the current label now does say glucosamine sulfate, potassium chloride, so what's on the front of the label matches what's in the supplement facts panel on the back. I guess at the time of the original complaint, and I think this court only has the photos of the original plaintiff's bottles, they just said glucosamine sulfate on the front. And that was not correct, right? That was not improper, and it gets technical, but it's not improper because of what the FDA says you can call a product. And so, to use Judge Boggs' acronym, there's GH and there's GS, and the more fulsome name for GS would be glucosamine sulfate, or if you want to add two more words, glucosamine sulfate, potassium chloride. Those last three things, GS, glucosamine sulfate. So in each of those, you can't just pluck out names of various elements and then put them together without it changing its meaning. So I would like to unpack that, too, though if I could take a detour to go back to the beginning of your question as far as Durnford and Amavisca. Amavisca, we think, was just wrongly decided with all due respect to Judge Klausner in that case, and the case has since settled, so this court won't be seeing it. With respect to Durnford, I think Durnford actually helps illustrate our position. In Durnford, and again, this court's opinion helpfully included not the front of the label, but the side panel and then the supplement facts panel. And what Durnford did is Durnford looked at the fact that the FDA had required manufacturers to represent a certain or count the protein in a product a certain way and requiring manufacturers to count it that way resulted in, with respect to the nutrition facts panel, the omission of amino acids, creatine monohydrate, nitrogen, things that would inflate the protein count. So the back had to say 40 grams of protein. The side panel, which was not FDA required, it was gratuitous by the manufacturer. It repeated what was on the supplement facts panel, and the court, in properly looking at the two different parts of the label, said the supplement facts panel is, any challenges to that are preempted because it says what the FDA has said it needs to say, even if it's misleading. But with respect to gratuitous marketing statements elsewhere on the packaging, there you have no cover from the FDA. The FDA hasn't told you to do it, and therefore those claims are not preempted. Now, to bring it forward to this case, in this case, the two things the plaintiffs are challenging, the supplement facts panel and the overarching name, those are both things that the FDA requires to be on a product. We've talked a lot about what the FDA requires to be on the supplement facts panel, and it's very, very detailed. But then to go back to your most recent question, Judge Wardlaw, the FDA has also said, and this is true whether you're looking at the statute, 343 sub B, or whether you're looking at its implementing regulations, 102.5A, or whether you're importing from the supplement facts panel, the analysis, all of those things say that you use the common or usual name of the ingredient. And so based on the fact, again, our COAs show that our product is the right kind of glucosamine, and therefore it was marketed as such. What's listed on the supplement facts panel is glucosamine sulfate potassium chloride. And so given that there's that one singular active ingredient, there's not a mixture of a bunch of different stuff, that one singular ingredient, then 343B, 102.5A, or even 101.36, all those things basically say, that's what you name the product. Because what the FDA has said with respect to the name on the front is that you have to name the product in a way that identifies or describes its characteristics or ingredients. And again, the one ingredient here is glucosamine sulfate potassium chloride, and so using that name was fine, and at the same time, the prior name, which omitted the last two words, it was the same substance. Everybody knows the same substance. Mr. Inslee Pruitt acknowledged that it's the same. And so even though we omitted the last two words with our prior iteration of the bottle, it doesn't matter because we were complying with the FDA's directive to call the product by its common or usual name based on what ingredient, singular, is in the product. Maybe I'm beating a dead horse here, but your statements and the stuff in the record about the importers and the raw materials that went into all of that, is that, you sort of said, well, we didn't really prove this, we attacked their attack, but why wouldn't you say that your import papers are good enough, or conversely, what more would you do if we said, okay, attacking their attack isn't good enough, what would you or your competitors do to prove what's in your bottle? That's a good question. I mean, we're not relying on it before this court because the district court didn't take that path and we're here defending the district court within the four corners of its order. I mean, I imagine we'd put on more affirmative evidence establishing that our product actually complied with the FDA regulations, more evidence explaining exactly how these COAs, sorry, specifics of analysis came into being. Again, our focus at the evidentiary hearing and in our pleadings because we elected to go with this attack the attack route focused on attacking the attack as opposed to proving affirmatively that our label is compliant. I was mentioning those things that we introduced just to give the court comfort that we're not trying to hide from anything here. Again, we're fully confident that our product is the one that it's supposed to be and we've such. With respect to Dr. Springer's methods, I know we've talked a lot about how does this whole regime work, to underscore, even if plaintiffs are correct that there is a blind spot or a gap, right? And the FDA regulations acknowledge that in certain cases there may be and then a reliable and appropriate substitute testing methodology may be used. The district court correctly found, and I think this gets clear error deference because it was Judge Wilson making a finding after an evidentiary hearing, the district court correctly found that Dr. Springer's methods were not reliable and appropriate. And he did that for a number of reasons. First, none of them are validated for glucosamine sulfate and Dr. Springer admitted that at excerpts page 130. And the FDA has said that when questions arise as to the validity of data, the agency will utilize the methods of the AOAC or other validated procedures. None of his methods are compendial. And again, various guidance from the FDA, including as recently as two years ago in their 2020 compliance manual, all methods used, whether compendial or non-compendial must be validated. And there's a strong preference for compendial methods. They, of course, are not peer reviewed, published or documented. And of course, we need to have at least his methods documented so they can be replicated and tested by, for example, our experts, but they're not written down anywhere. And he said it was, the opposing counsel said that they were used in patents and for XRD and he listed a number of other things that he said they were used for. So I think Dr. Springer used FTIR, Fourier Transform Infrared Spectroscopy, X-ray diffraction and then energy dispersive X-rays. He did three different tests. And they each have their own problems and they each suffer from the problems I just mentioned, which again, they're not validated, not compendial. His use of them on glucosamine sulfate has not been peer reviewed. And again, it's not documented, even with respect to the one journal article he mentioned, the SAHU article, Dr. Springer admitted that the tests there, some are the same and some are not. Those are his words, not mine. And with respect to the XRD, as we call it, X-ray diffraction library in particular, where Mr. Inslee Pruitt said that Dr. Springer was able to match this product to the GH, right? The wrong product. The fundamental problem there is that Dr. Springer's library doesn't have a reference standard for the right product for glucosamine sulfate potassium chloride. And so that's like an expert coming in and saying, I think it's gold because it looks gold, but I don't have the tools to detect iron. And so I can't rule out pyrite, but it's got to be gold. I mean, that really is the exact same thing that's happening here. And so finally, I guess Dr. Springer admitted, and this is on Supplemental Excerpt, page 486, that if we, the manufacturers, were to use his methods and take it to the FDA with a proposal to change the name of our product, the FDA would not accept it. And so I think that ultimately is kind of the biggest concession of all, that if we would be misbranding our product by adopting Dr. Springer's methodology and using it to I see I'm over my time. I'm happy to answer any other questions, or any questions the Court has. If you want me to keep going, I could stand up here all day. Thank you, counsel. Thank you, Your Honors. Thank you, Your Honors. As a small point, I want to follow up on the comment about Durnford. I want to also suggest that the Ninth Circuit opinion in Reed versus Johnson and Johnson is further in that line, where it says that a requirement to state a certain fact in the nutrition label is not a license to make that statement elsewhere on the product. So that's in line with what this Court has held in Durnford, that they're different between the front and the back. Now, with respect to what is in the product, we just heard that it's supposed to be one single crystal. And yet, the certified reference samples from the ER, EP, sorry, supposedly has a blend of two different things. So if their certified samples are the holy grail and incontrovertible, then shouldn't their product be a blend of the two different things? And I think it's important when we come back to look at what Dr. Springer did. He looked using FTIR, which is widely accepted in the field. Plenty of court cases that have accepted the use of FTIR. But importantly, Dr. Klivenov said on the stand he was not challenging the use of FTIR. He then confirmed that Dr. Springer's research using FTIR was highly likely to identify potassium sulfate in the defendant's products. So we have the defendant's expert agreeing that Dr. Springer's work shows that something is in there that is not supposed to be in there. That something is the potassium sulfate, at the least. We also say it's glucosamine hydrochloride. Why I keep on saying it's important to know that potassium sulfate is fertilizer? Because we're looking at a blend that is two to one. Two parts to one part of glucosamine hydrochloride to potassium sulfate. So about a third of this product is basically fertilizer. That's really important for a consumer to know that they're eating something that is a substantial portion of a product that is used for fertilizer. And again and again, we heard a reference saying that the FDA has required the use of compendial methods. As I discussed before, that is not accurate. The FDA has suggested and likes to use compendial methods. They're good things. They're great. But they're not the end all be all. You have to still assess those methods to ensure that they are appropriate for the task at hand. I see I'm out of my time, so I'll sit down. All right. Thank you, Counsel. Hollins v. Walmart will be submitted. And this session of the court is adjourned for this morning. Thank you. All rise. This court for this session stands adjourned.
judges: Boggs, WARDLAW, IKUTA